JOSEPH HENRY ROSSANA, Appellant, v. THE STATE OF NEVADA, Respondent.

No. 27295

March 27, 1997                                    934 P.2d 1045

*Neil J. Beller,* Las Vegas, for Appellant.

*Frankie Sue Del Papa,* Attorney General, Carson City; *Stewart L. Bell,* District Attorney, and *James Tufteland,* Chief Deputy District Attorney, and *Gary Booker,* Deputy District Attorney, Clark County, for Respondent.

---

[6]The Honorable A. William Maupin, Justice, did not participate in the decision of this matter.

## OPINION

*Per Curiam:*

### FACTS

Joseph Henry Rossana (Rossana) hired John Momot, Esq. (Momot) to perform legal services approximately twenty years ago. As their relationship progressed, Rossana and Momot became business partners in several ventures, including a Las Vegas bar, The Rumrunner, Inc. In 1985, Momot and Rossana's business relationship faltered, and Momot filed suit against Rossana to collect on his one-third interest in the Rumrunner after Rossana had sold the bar. In 1987, Momot hired attorney Jim Jimmerson (Jimmerson) to represent him in his civil suit against Rossana.

In September, 1992, the district court awarded judgment in favor of Momot in the amount of $225,779.09. In November, 1992, Momot executed judgment upon some of Rossana's personal assets and, allegedly, upon those of Rossana's daughter. On November 19, 1992, Rossana went to Momot's law office in an attempt to talk to Momot and instead spoke with Momot's brother and office manager, Joseph Momot (Joseph). Joseph testified that he perceived Rossana's demeanor as being threatening and frightening; Joseph stated that he asked Rossana if the conversation should be interpreted as a threat, testifying as follows:

> [Rossana] told me that [Momot] . . . is going to be sorry if continues [sic] with this activity and he'd better cease and desist, or words to that affect, otherwise he'll be very sorry for his activity. At which point I asked him if I should interpret this as a threat? Are you threatening my brother [Momot]? And at that time [Rossana] replied, well, I don't have a gun on me now. And then he went on to reiterate his previous statements . . . he didn't ask me rather he told me that the situation the way it presently stood was unacceptable
> . . . .

After Rossana left Momot's office, Joseph told Momot about the incident and filed a police report. Further attempts to execute on the civil judgment against Rossana were stayed when Rossana appealed the judgment to this court and concomitantly filed a bankruptcy petition. The parties presented oral argument in early January, 1994, and this court affirmed the civil judgment and denied Rossana's appeal in May, 1994.

Meanwhile, between April, 1993 and January, 1994, Momot and Jimmerson's vehicles were repeatedly vandalized, and on January 20, 1994, shots were fired at Momot's residence in the early morning hours. Rossana was charged with committing these acts. At Rossana's trial, the State asserted that the civil judgment against Rossana, Momot's efforts to execute upon the judgment, and the dismissal of Rossana's appeal motivated Rossana to commit these criminal acts.[1] The State further asserted that acts of vandalism coincided with major events in the civil action Rossana was appealing.

On April 6, 1993, Momot filed a motion to dismiss Rossana's appeal; on April 16, 1993, a re-notice of a creditors meeting was filed in bankruptcy court; and on April 26, 1993, an ex parte extension of time was granted to Rossana to transmit the record on appeal. On April 15, 1993, Jimmerson's 1992 Mercedes was vandalized with acid at his office. On April 26 and 27, 1993, Momot's 1980 Mercedes was "keyed" (scratched with a key) and had solvent poured on it at his law office garage.

On May 3, 1993, Momot filed a second motion to dismiss Rossana's civil appeal, Rossana filed an opposition, and Momot filed a response, asking for sanctions against Rossana. On May 24 and 25, 1993, Momot's 1980 Mercedes was keyed at his office parking lot.

In June, 1993, Rossana filed a supplemental opposition to Momot's motion to dismiss, there was a bankruptcy hearing pertaining to an order to show cause, a notice of approval of disclosure statement was filed, and on June 23, 1993, Momot filed a third motion to dismiss Rossana's civil appeal. On June 9, 1993, Momot's Mercedes was once again keyed in his office parking garage. On June 20, 1993, the top of Momot's wife's (Sandra) 1978 Mercedes convertible was slashed open, and chemicals and paint were sprayed on that car and on Momot's son's 1978 BMW, both parked at Momot's residence. On June 18, 1993, Jimmerson's 1992 Mercedes was keyed while parked in front of a local bar and grill located in the vicinity of the Rumrunner bar. Momot testified that his 1980 Mercedes was again keyed at his office garage on July 20, 1993.[2]

Following these acts of vandalism, Momot had surveillance

---

[1] It should be noted that although both sides make reference to the damage done to Jimmerson's vehicles, and Jimmerson testified to that damage, the district court, in charging the jury, referred only to damage done to Momot and his wife's vehicles. The information also fails to mention the damage done to Jimmerson's vehicles.

[2] Jimmerson testified that one of his other cars, a 1990 Mercedes, was keyed and molasses was poured on the exterior at his office building on September 3, 1993; the State does not link this event to any concurrent action in the civil or bankruptcy proceedings.

video equipment installed at his home and in his parking garage at work. On December 13 and 22, 1993, the surveillance camera recorded a man allegedly inserting nails into the tires of Momot's 1980 Mercedes while it was parked in his office garage; Momot, Joseph, and a private investigator, Michael Wysocki (Wysocki), hired by Momot to locate the perpetrator, testified that the man in the video was indeed Rossana.

In early January of 1994, Rossana's civil appeal was argued before this court. Momot's neighbor testified that on January 20, 1994, at approximately 1:00 a.m., he awoke to a gunshot, looked out his window, and saw a second gunshot fired at Momot's house from the open driver's side window of a four door car with tinted windows parked in front of the Momot house. Sandra testified that she and her daughter (who were sleeping in the house) heard the two shots fired at their home. A light fixture above the garage had been shattered, so Sandy swept up the glass and threw the debris into a trash can. Police later found a deformed bullet fragment in that trash can.

Wysocki reviewed the video of the car from which the shots were fired at Momot's house, drove to Rossana's house, and concluded that Rossana's car was similar to the car depicted in the surveillance video. Momot then turned over to the Las Vegas Metro Police the videos (from December 13 and 22, 1983) allegedly depicting Rossana putting nails into Momot's car tires along with the video of the shooting incident. Detective Ramos testified that a warrant was then obtained and Rossana's home was searched on January 21, 1994.

Although no nail guns or caustic chemicals were found at Rossana's home, a .38 caliber pistol was recovered. The gun was found in Rossana's bedroom, and it had four bullets in its cylinder and two empty chambers. Police also collected two spent bullet casings from Rossana's bedroom. Forensic tests on the items retrieved from Rossana's home and the bullet fragment recovered at Momot's residence were inconclusive.

On July 11, 1994, the State filed an information against Rossana charging him with aggravated stalking, malicious destruction of property (felony and gross misdemeanor), discharging a firearm at or into a structure, and discharging a firearm out of a motor vehicle (this last count was eventually dropped). On February 23, 1995, a jury found Rossana guilty on all remaining counts.

## DISCUSSION

*The district court properly admitted lay opinion testimony regarding the identity of a person depicted on a surveillance videotape*

At trial, the State wanted to ask Momot, Joseph, and Wysocki to identify the man in the videotaped surveillance which allegedly

depicted Rossana inserting nails into the tires of Momot's car while it was parked in the garage of Momot's office. Rossana objected, arguing that such testimony would be unfairly prejudicial as it would be impossible for "anyone in this universe [to] in good conscience" identify the man in the video as Rossana. After the district judge reviewed the video outside the presence of the jury, he permitted witnesses to express their opinions as to the identity of the man in the video.

Momot, Joseph, and Wysocki each watched the video in front of the jury and each unequivocally testified that the man depicted therein was Rossana. These witnesses claimed to have known Rossana at the time of the alleged criminal activity and testified that his appearance at trial differed substantially from the time when the video was taken in that Rossana had since lost about thirty pounds, cut his hair, and was now wearing glasses. Rossana then called a witness (a private investigator) who testified as to the poor quality of the video and the impossibility of identifying anyone from the video. Next, Rossana called a friend of fifty years to testify that he was unable to identify Rossana in the video.

On appeal, Rossana argues that permitting the subjective testimony of Momot, Joseph, and Wysocki constituted reversible error, as it is the jury's exclusive responsibility to determine the ultimate issue of guilt or innocence. *See* Bennett v. State, 794 P.2d 879, 882 (Wyo. 1990) (holding that lay witness opinion as to guilt of defendant inadmissible). The relevant Nevada rule mirrors Federal Rule of Evidence (FRE) 701.[3] Since Nevada has not specifically discussed the admissibility of opinion by a lay witness as to the identity of an individual in a surveillance videotape, federal law is instructive.

There is a plethora of federal jurisprudence holding that lay witnesses' opinion testimony is admissible where it identifies the defendant as the perpetrator of a crime from a surveillance video. United States v. Saniti, 604 F.2d 603, 604-05 (9th Cir. 1979). Generally, a lay witness may testify regarding the identity of a person depicted in a surveillance photograph " 'if there is some basis for concluding that the witness is more likely to correctly identify the defendant from the photograph than is the jury.' "

---

[3]NRS 50.265 provides that:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are:
> 1. Rationally based on the perception of the witness; and
> 2. Helpful to a clear understanding of his testimony or the determination of a fact in issue.

United States v. Towns, 913 F.2d 434, 445 (7th Cir. 1990) (quoting United States v. Farnsworth, 729 F.2d 1158, 1160 (8th Cir. 1984)). In *United States v. Barrett*, 703 F.2d 1076, 1086 (9th Cir. 1986), the Ninth Circuit concluded that the opinion testimony of a lay witness would be particularly appropriate where the witness was familiar with the defendant at the time of the crime and the defendant's appearance had changed by the time of trial.

Additionally, in United States v. Jackman, 48 F.3d 1, 5 (1st Cir. 1995), the court held that testimony given by the defendant's ex-wife, identifying him in a poor quality bank surveillance photograph (in which his face was partially obstructed), was permissible. The *Jackman* court stated that ''[h]uman features develop in the mind's eye over time. These [lay] witnesses had interacted with defendants in a way the jury could not, and in natural settings that gave them a greater appreciation of defendants' normal appearance.'' *Id*. However, the *Jackman* court would not allow such testimony where a photograph is deemed ''so hopelessly obscure that the witness is no better-suited than the jury to make the identification.'' *Id*.

We conclude that federal case law, in conjunction with Nevada's adoption of the federal evidence rules governing opinion testimony of lay witnesses, mandates that Rossana's claim must fail. Moreover, Rossana effectively diluted any possible prejudice in calling witnesses to contradict the three witnesses' testimony. The jury could see the quality of the videotape and presumably could judge the credibility of those witnesses' assertions about the video. Therefore, we conclude that Rossana's arguments on this issue are meritless.

*The jury was improperly instructed on the crime of aggravated stalking*

At the trial below, the court gave Jury Instruction No. 5, regarding the offense of aggravated stalking, which stated:

> Any person who wilfully, unlawfully, and intentionally engages in a course of conduct that would cause a reasonable person to feel; and the victim actually is caused to feel: terrorized, frightened, intimidated or harassed, and placed in reasonable fear of death or substantial bodily harm, is guilty of Aggravated Stalking.

Nevada's stalking statute, NRS 200.575, provides, in pertinent part, that:

> 1. A person who, without lawful authority, willfully or maliciously engages in a course of conduct that would cause

a reasonable person to feel terrorized, frightened, intimidated or harassed, and that actually causes the victim to feel terrorized, frightened, intimidated or harassed, commits the crime of stalking. . . .

. . . .

2. A person who:

(a) Commits the crime of stalking and in conjunction therewith *threatens the person with the intent to cause him to be placed in reasonable fear of death or substantial bodily harm* . . . .

. . . .

*commits the crime of aggravated stalking.*

(Emphasis added.)

"An accurate instruction upon the basic elements of the offense charged is essential, and the failure to so instruct constitutes reversible error." Dougherty v. State, 86 Nev. 507, 509, 471 P.2d 212, 213 (1970). We conclude that the district court prejudicially erred in failing to instruct the jury that a necessary element of aggravated stalking is that the defendant must have *threatened* the victim.[4]

We note that Rossana failed to object to the instruction in the proceedings below and that generally such an omission bars review on appeal. McCullough v. State, 99 Nev. 72, 74, 657 P.2d 1157, 1158 (1983). However, in this case, we conclude that a case of plain error has been viably asserted and thus this court may address any concomitant constitutional issues sua sponte. *Id.*; *see* Patterson v. State, 111 Nev. 1525, 1530, 907 P.2d 984, 987 (1995) ("error is 'plain' if 'the error is so unmistakable that it reveals itself by a casual inspection of the record.' ") (quoting Torres v. Farmers Insurance Exchange, 106 Nev. 340, 345 n.2, 793 P.2d 839, 842 n.2 (1990)).

The State argues that the given instruction included the statutory elements of aggravated stalking, identifying those elements as *a subjective element* ("actually causes the victim to feel . . . ."); an *objective element* ("cause[s] a reasonable person to feel . . . ."); and a *specific intent element.* NRS 200.575. The State asserts that the requirement of a threat in conjunction with stalking conduct (i.e., specific intent) is implicitly found by reading

---

[4]The legislative history showing the evolution of Nevada's anti-stalking statute indicates that NRS 200.575 was patterned on other jurisdictions' statutes that require "a credible threat" in conjunction with misdemeanor stalking to constitute the felony of aggravated stalking.

the objective and subjective elements together. We do not agree with this analysis.

The State cites this court's law for the proposition that the district judge had broad discretion in deciding whether terms within the jury instruction need to be defined. Dawes v. State, 110 Nev. 1141, 1145-46, 881 P.2d 670, 673 (1994). We conclude that *Dawes* is inapposite to the issue at hand; Rossana does not complain that words defining threatening behavior were omitted; rather, he points out that the specific and necessary element of threatening conduct was expressly omitted from the instruction.

It is true that the given instruction is not identical to the statutory definition of misdemeanor stalking (NRS 200.575(1)), in that the word "intentionally" has been added. Nonetheless, the way the instruction reads, a defendant need only have the intent to engage "in a course of conduct which would cause a reasonable person to feel" and actually causes a person to feel terrorized, etc., to have committed the offense of aggravated stalking. However, the crime of aggravated stalking requires something more in that the defendant must not only engage in intentional (i.e., volitional) conduct that causes a specific result, but that the defendant must *threaten with the intent to cause the victim to be placed in reasonable fear of death or substantial bodily harm*. NRS 200.575(2)(a). The defendant must *threaten* the victim.

The Sixth Amendment of the U.S. Constitution mandates that the jury find all elements of a given crime; failing to instruct the jury about essential elements of a crime constitutes constitutional error in that the jury may convict the defendant without finding the defendant guilty of a necessary element of a crime. United States v. Caldwell, 989 F.2d 1056, 1061 (9th Cir. 1993). We conclude that in Rossana's case, an essential element (i.e., defendant must stalk *and* threaten with intent to cause fear, etc.) was erroneously omitted from the jury instruction regarding aggravated stalking. Accordingly, we conclude that Rossana's due process rights have been compromised such that reversal of his conviction on this count is warranted.

*Sufficiency of the evidence*

The standard for reviewing the sufficiency of the evidence "is not whether this Court is convinced of the defendant's guilt beyond a reasonable doubt, but whether the jury, acting reasonably, could have been convinced to that certitude by the evidence it had a right to consider." Wilkins v. State, 96 Nev. 367, 374, 609 P.2d 309, 313 (1980).

*Count II—malicious destruction of property (felony)*[5]

On this count, the district judge instructed the jury to determine whether between April, 1993 and January 20, 1994, Rossana "willfully, unlawfully and maliciously" damaged Momot's Mercedes 450 SL by spraying corrosives on the car, scratching the paint, and/or puncturing the tires with nails. Momot testified that it cost approximately $1,250.00 to repair the tire damage. We conclude that while the evidence was sufficient to convict Rossana of gross misdemeanor malicious destruction of property, it did not support conviction upon this felony count.[6]

Pursuant to NRS 193.155, a felony conviction for a public offense under NRS 206.310 requires damages to property of $5,000.00 or more. We conclude that, while there may have been substantial evidence for a reasonable jury to conclude that Rossana damaged Momot's tires with a nail gun (i.e., the surveillance video), there was not substantial evidence to convict Rossana of damaging the finish of the 450 SL with chemicals or by keying. The State's only evidence was Momot's time line which professed to link events in the Momot-Rossana civil litigation to Rossana's alleged acts of vandalism; in reviewing the record, we conclude that there was insufficient evidence upon which a reasonable trier of fact could have concluded that Rossana vandalized Momot's car in this manner.

The 450 SL was vandalized on April 26 and 27, May 24 and 25, June 9, July 20, and December 13 and 22, 1993. But, there were no witnesses presented to place Rossana anywhere in the vicinity of the 450 SL on the dates of the vandalism, and no caustic substances were found at Rossana's residence, pursuant to the execution of the January 21, 1994 search warrant. Therefore,

---

[5]We need not address this issue as it pertains to Count I—aggravated stalking—because we remand for retrial on this count due to improper jury instructions.

[6]The complete text of NRS 206.310, under which Rossana was charged on this and the third count, provides that:

> Every person who shall willfully or maliciously destroy or injure any real or personal property of another, for the destruction or injury of which no special punishment is otherwise specially prescribed, shall be guilty of a public offense proportionate to the value of the property affected or the loss resulting from such offense.

NRS 193.155 delineates the "[p]enalty for public offense proportionate to value of property affected or loss resulting from offense." On Count II of malicious destruction of property, the damage was assessed as $5,000.00 or more, and thus the crime constituted a felony. NRS 193.155(1). Count III asserts damages in an amount between $250.00 and less than $5,000.00, a gross misdemeanor. NRS 193.155(2).

we conclude that a rational trier of fact could not find sufficient evidence to find Rossana guilty of *felony* malicious destruction of property beyond a reasonable doubt.

### Count III—malicious destruction of property (gross misdemeanor)

As to this alleged offense, the district court instructed the jury to determine if, on June 20, 1993, Rossana damaged Momot's ex-wife's car, which was parked in front of the Momot residence. It was alleged that Rossana ripped the convertible roof of this 1978 Mercedes 450 SL and applied caustics and/or spray paint to the interior and exterior. Damages for this incident of vandalism were assessed at greater than $250.00 and less than $5,000.00.

We reiterate our conclusions in the above section concerning damage to the finish of Momot's car. The events transpiring in the civil action against Rossana do not constitute substantial evidence upon which to convict Rossana on this count. Moreover, there were no witnesses presented to place Rossana anywhere in the vicinity of the 450 SL on the dates of vandalism, and no caustic substances were found at Rossana's residence, pursuant to the execution of the January 21, 1994 search warrant. Therefore, we conclude that a rational trier of fact could not find substantial evidence to find Rossana guilty of gross misdemeanor malicious destruction of property in regard to Sandra's car.

### Count IV—discharging a firearm at or into a structure

Rossana was accused and convicted of firing two shots at Momot's residence in the early morning of January 20, 1994. We conclude that the evidence is circumstantial and hardly abundant, however, a rational jury could have been convinced of Rossana's guilt on this offense beyond a reasonable doubt. Wysocki testified that some time after the shooting he identified a car similar to the car depicted in the surveillance video of the shooting of Rossana's residence on January 20, 1994.[7] Analyses of the bullet found at Momot's house and the gun (a .38 caliber) retrieved from Rossana's residence were inconclusive. The .38 had six chambers, four were loaded, two empty, and the casings of two bullets were found at Rossana's house. The bullet retrieved from

---

[7]Upon reviewing the tape of the shooting, Wysocki determined that the car involved was a small silver or gray four door Toyota, Honda, or Nissan, late 1980s or early 1990s, with tinted windows. A silver four door Acura with tinted windows was parked at Rossana's home on January 20, 1994, and he was the registered owner of that car.

Momot's house may or may not have been fired from the .38 found in Rossana's possession on January 21, and the State's expert testified that there was no way to determine when the two bullets missing from the chamber might have been fired.[8]

This court has held that "[i]dentification of a suspect based solely upon the clothing that the suspect was wearing at the time of committing the crime may be a sufficient basis for conviction even where there are no other identifying characteristics." Walker v. State, 111 Nev. 497, 498-99, 893 P.2d 366, 367 (1995). We see no reason not to expand this principle concerning clothes to cars. Along with Rossana's motive to harm Momot and/or his property, the matching car and the gun with two missing bullets found at Rossana's house supported the jury's verdict on this count.

## CONCLUSION

We conclude that the jury was improperly instructed as to the elements of the crime of aggravated stalking, resulting in prejudicial error and, therefore, Rossana's conviction on this count must be reversed and remanded to the district court for a new trial on this issue. We further conclude that there was no error in admitting into evidence the testimony of lay persons identifying Rossana on the surveillance video. Finally, as to the sufficiency of the evidence, we conclude that there was insufficient evidence to convict Rossana of charges of felony malicious destruction of property, however, a reasonable jury could have found Rossana guilty of the charge of discharging a firearm at or into a structure and gross misdemeanor malicious destruction of property.

We reverse Rossana's conviction on felony malicious destruction of property, and affirm the convictions for gross misdemeanor malicious destruction of property (for the tire damage to Momot's car) and discharging a firearm into a structure. We remand the case for a new trial on the charge of aggravated stalking with instructions to properly apprise the jury of the necessary threat element of the offense.[9]

---

[8]The State's brief erroneously states that "forensic testing concluded that Defendant's weapon had recently fired two (2) casings when the weapon was found . . . ."

[9]THE HONORABLE A. WILLIAM MAUPIN, Justice, did not participate in the decision of this matter.